**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Richard P. Matsch**

Civil Action No. 13-cv-00358-RPM

STEPHEN SCHULER, JR.,

    Plaintiff,

v.

THE UNIVERSITY OF DENVER,

    Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

Plaintiff Stephen Schuler has two claims remaining against Defendant University of Denver ("DU"):  disability discrimination and retaliation under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and 34 C.F.R. § 100.7(e).  DU has moved for summary judgment on those claims.  The following facts are material and are not in genuine dispute unless otherwise stated.

Schuler was diagnosed with insomnia, anxiety disorder, and depression when he was 16 years old.  Schuler was also diagnosed with attention deficit disorder in 2009.  [Doc. 39, Statement of Undisputed Material Facts ("SOF") ¶ 3-4.]

Schuler obtained his GED in 2005 and enrolled in Metropolitan State University of Denver ("Metro") that year.  He began attending DU's Daniels College of Business ("DCB") as a Finance/Real Estate major in the Fall Quarter of 2007.  Schuler lived in student housing

while attending DU and he paid for his tuition and housing with a combination of student loans and scholarships. [Id. ¶¶ 5, 7-8.]

Upon enrolling, Schuler requested disability accommodations from DU by submitting a letter from Dr. Kevin Cowperthwaite, the psychiatrist who treated Schuler while he attended Metro, and speaking to Michele McCandless, Associate Director of DU's Disability Services Program ("DSP"). The requested accommodations included quiet test-taking conditions, clear written instructions, time extensions for tests, occasional extensions on course work, occasional class excuses, and a private dorm room. DU approved Schuler's initial requests. DSP provided Schuler with a letter he could give to his instructors that described the accommodations to which he was entitled. The letter also advised instructors that any information about Schuler's disabilities was confidential and encouraged instructors to contact DSP if they had any questions. In almost every class Schuler took at DU, the DSP assisted him in obtaining accommodations. Schuler worked with Lisken Seader, a DSP Disabilities Specialist, on several occasions to request and obtain accommodations. [Id. ¶¶ 9-15.][1]

In Fall Quarter 2008, Schuler switched his major to Accounting and started taking classes in DU's School of Accountancy. Schuler took Intermediate Accounting 1 with Professor Darius Fatemi that quarter. Schuler requested and received his documented test-taking accommodations of a reduced distraction environment, clear instructions, and extended time. Schuler also worked directly with Fatemi on a public speaking accommodation, even though Schuler did not provide Fatemi documentation for his request. Fatemi granted the

---

[1] Schuler disputes that DU provided the initial accommodations he requested. [Doc. 53 ¶ 11.] The accommodations he claims were not provided were not a part of his initial accommodation request.

accommodation and permitted Schuler to create a PowerPoint presentation instead of giving an oral presentation to the class.  Fatemi later saw Schuler give an oral presentation in another class.  The parties dispute how Fatemi reacted; Schuler claims Fatemi yelled at him, which Fatemi denies.  Fatemi subsequently removed a second public speaking assignment from the course syllabus.  [Id. ¶¶ 19-25.]

At the end of Fall Quarter 2008, Schuler had a panic attack while taking a final exam in his Core 1 Fundamentals of Accounting class with Professor David Honodel.  Schuler told DSP about the panic attack after the exam, and he asked to retake it as an accommodation. DSP approved Schuler's request.  Schuler successfully completed the course.  [Id. ¶¶ 16-18.]

In Winter Quarter 2009, Schuler took Cost Management with Professor Honodel. Schuler withdrew from the class before completing it.  [See Doc. 53, Ex. 15.]  On April 20, 2009, Schuler filed a Complaint against DU with the U.S. Department of Education's Office of Civil Rights ("OCR") based on Professor Honodel's alleged failure to provide Schuler accommodations in the class.  The OCR and DU entered into a Resolution Agreement on July 7, 2009, under which DU agreed to allow Schuler to retake Cost Management with a different professor, send Schuler a letter apologizing for Honodel's conduct, and train School of Accountancy professors on their legal obligations to students with disabilities.  [Doc. 53, Ex. 7.]  DU satisfied those requirements.  [SOF ¶¶ 27-30.]

Kathleen Davisson, a professor and an Assistant Director of the School of Accountancy, was involved in coordinating scholarship distribution for students in the School of Accountancy during the first part of Schuler's tenure at DU.  Professor Davisson worked with a committee to determine the best way to allocate scholarship funds to apply them to as

many students as possible.  Donors like to see their funds being used, and if they are not used, they will often stop providing scholarship funding.  [Id. ¶¶ 32-33.][2]

The J.J. Johnston Scholarship was awarded through the DCB.  Half of the scholarship's funds are allocated for School of Accountancy students and the other half are for students in DCB.  During the time Schuler attended DU, the criteria for the J.J. Johnston Scholarship was broad and flexible; it was awarded to students who were "deserving."  A student did not need to have financial need or meet particular academic requirements to qualify for the scholarship.  [Id. ¶¶ 34-35.][3]  Schuler received $1,000 per quarter from the J.J. Johnston Scholarship from Fall Quarter 2007 through Spring Quarter 2009.  [Id. ¶ 36.]

While the School of Accountancy committee was deciding how to allocate funds for the 2009-2010 school year, the Dean's Office noticed that Schuler qualified for a scholarship from the Brandenborg Endowment Fund Scholarship, which was reserved for students with high financial needs.  Professor Davisson approved converting Schuler's J.J. Johnston Scholarship to a Brandenborg Scholarship for the 2009-2010 year because, by moving to a fund with more restrictive requirements, additional aid was available to other students under the J.J. Johnston Scholarship.  The scholarship committee frequently moves students to different scholarships to maximize use of the funds and provide aid to as many students as possible.  Davisson stated in her affidavit that she did not convert Schuler's scholarship to

---

[2] Schuler cites his own affidavit to dispute facts 32 and 33.  [See Doc. 53 ¶¶ 32-33.]  Schuler has not shown that he has personal knowledge of the inner workings of School of Accountancy's scholarship committee or the desires of donors.
[3] Schuler maintains that DU cannot prove facts 34 and 35 through Professor Davisson's affidavit.  [See Doc. 53 ¶¶ 34-35.]  Because Professor Davisson was a member of the School of Accountancy's scholarship committee, she has sufficient personal knowledge to support facts 34 and 35.

penalize or retaliate against him in any way.  [Id. ¶¶ 37-39.][4]  Schuler received $1,333.36 per quarter under the Brandenborg Endowment Fund Scholarship, as opposed to $1,000 per quarter under the J.J. Johnston Scholarship.  [Id. ¶ 40.]

Schuler filed another OCR Complaint sometime in early 2010, based on Professor Davisson's alleged "cancellation" of his J.J. Johnston Scholarship.  DU and Schuler signed an Early Complaint Resolution Agreement on February 16, 2010, in which Davisson agreed to explain why she approved converting his J.J. Johnston scholarship.  [Id. ¶¶ 41-42.]

On Friday, February 5, 2010, Schuler emailed Liskin Seader and Michele McCandless of DSP asking them to notify a professor he would not be attending class for the public speaking assignment that coming Monday.  Schuler claimed he could not complete the assignment because he did not want to "have a problem with [his] heart[.]"  [Id. ¶¶ 44-45.] Seader replied that DSP would notify Schuler's instructor of his absence, noted that Schuler had recently missed "more than a couple of classes" due to health issues, and stated:

> If your health/medical management issues are impacting you at a level that regularly prevents you from attending class I wonder if you might want to consider taking a medical stop out. Please understand that I am not "recommending" that you do it but only suggesting that you might want to consider that as an option. If you need more information regarding the medical stop-out please let me know. I would be glad to assist you with the process.

[Doc. 39, Ex. P at 3.]  A stop-out allows a student to withdraw from DU for a variety of reasons and receive a tuition refund for the quarter.  A stop-out can be taken when a student is having medical issues.  A medical stop-out request must be supported by appropriate medical documentation.  [SOF ¶ 47.]

---

[4] Schuler cites his own affidavit to dispute that the Dean's Office decided to convert his scholarship because of his financial need.  [See Doc. 53 ¶ 37.]  Schuler does not have personal knowledge of the School of Accountancy's communications with the Dean's Office regarding this issue or of the motives of Professor Davisson and the scholarship committee.  Schuler also cites an e-mail, but it is from May 2011 and does not touch on the facts at issue.

Ten days later, Schuler requested a medical stop-out from DU's Office of the Registrar for Winter Quarter 2010.  The Withdrawal Form Schuler signed stated:

> I understand that my withdrawing from the University will affect my eligibility to remain in student housing, to use campus facilities, and to retain health insurance benefits.  My current and future financial aid awards will be affected and I may be liable for tuition owed as a result of the return of financial aid funds.

[Doc. 39, Ex. R.][5]  Schuler submitted a letter from his psychiatrist, Dr. Neil Weiss, who stated that he believed a withdrawal was medically necessary because Schuler's medical conditions were disrupting his school work.  Jo Calhoun, Associate Provost of Academic Resources at DU, approved Schuler's request for a medical stop-out on March 1, 2010.  DU refunded Schuler's tuition for Winter Quarter 2010.  [SOF ¶¶ 51-53.]

In March 2010, Schuler submitted a letter from Dr. Weiss stating that Schuler was able to return to school full-time and was not on any medications that would interfere with his schoolwork.  DU approved Schuler to return to school for Spring Quarter 2010 two days after receiving Weiss' letter.  When Schuler returned to school, he did not have any problems with his financial aid and scholarships.  [Id. ¶¶ 54-56.]  On March 25, 2010, Schuler submitted another letter from Dr. Weiss to DSP, stating:

> Stephen Schuler has requested that I document to you his diagnosis of A.D.D. + PTSD. These conditions are being treated with therapy plus appropriate medications. In addition he requests I inform you that his symptoms can interfere with his public speaking.

[Doc. 39, Ex. U.][6]  Schuler completed four classes in Spring Quarter 2010 and was in good standing at the end of it.  [Doc. 53, Ex. 15.]

---

[5] Schuler claims he did not read the form before he signed it because Lisken Sander, who handed him the form to complete, "was in a hurry that day."  [Doc. 53 ¶ 50.]  Schuler's failure to read the form does not mean he is thereby exempt from the form's terms and conditions.

[6] The parties dispute whether this was the first time Dr. Weiss informed DSP that Schuler needed public speaking accommodations.  [See Doc. 39 ¶ 57; Doc. 53 ¶ 57.]  This dispute is not material.

Schuler registered for classes for Summer Quarter 2010 and also signed up to remain in student housing, but he dropped his classes before the quarter started. Schuler did take Cost Management during that quarter to rectify the Incomplete grade he was given after withdrawing from Professor Honodel's Cost Management class in Winter Quarter 2009. Schuler's transcript does not list him as being formally enrolled in any classes in Summer Quarter 2010. [Doc. 53, Ex. 15.] Although Schuler "completed" Cost Management in August 2010 [Doc. 53, Ex. 18], according to Joe Benson, DU's Director of Student Financial Services, a student completing an Incomplete is not formally registered for the class in the quarter he completes it. [See Doc. 61 at 7 (citing Ex. GG at 35:25-36:18).]

DU reversed Schuler's financial aid for Summer Quarter 2010 because he was not registered for classes that quarter. Because Schuler continued to live in DU housing without being formally enrolled in classes and without receiving financial aid, he accrued a balance on his student account for his housing charges. [SOF ¶¶ 58-60.] DU's Bursar's Office e-mailed Schuler about his student account balance on June 24 and July 9, 2010. [Id. ¶ 61.][7]

By the time Schuler's balance accrued for summer housing, Schuler had already registered for Fall Quarter 2010 classes. DU did not require him to drop his classes at that time. This is a common practice because registration for Fall Quarter occurs before the Bursar's Office can notify the Registrar of any holds from summer. [Id. ¶ 62.][8]

On August 2, 2010, the Bursar's Office contacted Schuler regarding the balance he owed for his summer housing. The Bursar's Office told Schuler he would not be able to register for Winter Quarter 2011 until the balance was paid in full. The Bursar's Office also told

---

[7] Schuler disputes this but does not offer record evidence in support.
[8] Schuler disputes this but does not offer record evidence in support.

Schuler that his Fall Quarter 2010 financial aid could not be directly applied to the balance because the balance was from the previous academic year. The Bursar's Office noted that Schuler would be receiving a financial aid refund check[9] for his Fall Quarter 2010 financial aid, which he could then use to repay DU for his outstanding balance. Schuler agreed to make installment payments. [Id. ¶¶ 64-68.][10]

On August 17, 2010, Schuler made a payment of $12 toward his outstanding housing balance. He did not make any payments thereafter. [SOF ¶ 69.] Sometime in August 2010, DU allowed Schuler to move to another apartment after he expressed concerns about loud noises in his apartment complex. [Id. ¶ 70.]

On September 7, 2010, DU sent Schuler a refund check for his Fall Quarter 2010 financial aid in the amount of $1,062.10. [Doc. 39, Ex. M ¶ 14.][11] Schuler was awarded the Reano Scholarship for the 2010-2011 academic year, which provided him the same amount as the Brandenborg Endowment Fund Scholarship ($1,336 per quarter). [SOF ¶ 43.]

At some point in early Fall Quarter 2010, Schuler asked DSP to exempt him from oral presentations in all of his accounting classes. On October 11, 2010, Michele McCandless of DSP informed Schuler that she met with the new director of the School of Accountancy, Dr. Sharon Lassar, to discuss the request. According to McCandless, Lassar told her that oral communication skills are considered a vital component of an accounting degree. [Doc. 39,

---

[9] At the hearing held on September 25, 2014, counsel for DU explained that federal financial aid funds are deposited directly into the recipient's student account at DU. If the amount deposited exceeds the total amount due on the student's account, DU issues a "financial aid refund" check to the student in the amount of the excess. The student may use the financial aid refund however she or he chooses.

[10] Schuler relies on his affidavit to dispute facts 64-68, but his dispute is only based on a speculative belief that the Bursar's Office records are false. [See Doc. 53, Ex. 2 ¶ 14.]

[11] Schuler denies receiving a refund check, but his own affidavit states: "On September 7, 2010 I received a refund check which was from the proceeds of my private COCPA Scholarship and many other sources of funding." [Doc. 52, Ex. 2 ¶ 17.]

Ex. Y.][12]   Therefore, McCandless told Schuler that his exemption request was denied.  [Id.]

Instead, Lassar and the DSP agreed that Schuler would only need to give oral presentations

to his instructor and a chosen classmate or two.  [Id.][13]

McCandless e-mailed Schuler information about the medical stop-out process on October

14, 2010.  The process had not changed since he took his first medical stop-out earlier that

year.[14]  McCandless assured Schuler he would not be "'kicked out' of the University for

requesting or taking another medical stop out."  McCandless directed Schuler to a website

with more information on the stop-out procedure and said that a staff member from DSP or

Academic Advising could assist him through the application process.  DSP did not have any

role in approving Schuler's requests for medical stop-outs or his requests to reenter DU after

those stop-outs.  [SOF ¶¶ 76-78.][15]

On October 26, 2010, Schuler submitted a request to take a medical stop-out for Fall

Quarter 2010.  Schuler's stop-out request was supported by a note from Dr. Weiss.  In his

Medical Stop-Out Form, Schuler acknowledged that "it is my responsibility to obtain

appropriate advising upon my return to the University and to discuss with the Office of

Financial Aid how this absence will affect my financial aid package."  [Doc. 39, Ex. AA at

3.][16]  The form also stated that Schuler would not be able to return to DU unless he provided

a letter from his health care provider clearing him to return.  [See id. at 1.]

---

[12] Schuler denies that oral communication skills are necessary for all meaningful areas of employment in the accounting field.  [Doc. 53 ¶ 74.]  He does not support that claim with record evidence.

[13] Schuler denies that this modification was made but he does not support his denial with record evidence.  [See Doc. 53 ¶ 75.]

[14] Schuler claims that the medical stop-out process had changed since his earlier stop-out.  [See Doc. 53 ¶ 76.] Schuler does not support that claim with record evidence.

[15] Schuler cites his own affidavit to dispute that DSP did not have any role in the stop-out process.  [See Doc. 53 ¶ 78.]  Schuler has not shown that he has personal knowledge of the approval process for medical stop-outs.

[16] Schuler denies that the form he signed required acknowledgement, and states that he sought advice from the Office of Financial Aid.  [Doc. 53 ¶ 81.]  He does not support those assertions with record evidence.

Jo Calhoun approved Schuler's request for a stop-out during Fall Quarter 2010 on November 1, 2010.  Thereafter, DU refunded Schuler's tuition for Fall Quarter 2010 and reversed Schuler's other financial aid and scholarships.  His financial aid package was not cancelled; he was just ineligible to receive it while he was not enrolled in classes.  The Bursar's Office followed all federal financial aid regulations and DU policies with regard to Schuler's financial aid and scholarships.  [SOF ¶ 89.][17]

Schuler continued to live in student housing for the remainder of Fall Quarter 2010, even though he was not enrolled in classes.  [Id. ¶ 87.]  Schuler was also able to keep his health insurance because his policy did not expire until March 2011.  [Id. ¶¶ 82-86.][18]

DU did not permit Schuler to register for Winter Quarter 2011 because he never submitted documentation showing he was medically cleared to return to DU from his stop-out and because he had a financial hold on his account due to his failure to pay for student housing expenses.  [Id. ¶¶ 92-94.][19]

Mike Furno, DU's Associate Director of Housing, permitted Schuler to remain in housing during Winter Quarter 2011 because Schuler said that he had worked out a payment plan with the Bursar's Office to resolve his outstanding balance and would be returning to classes for the Spring Quarter 2011.  Schuler was expected to pay for his housing costs regardless of

---

[17] Schuler claims that his financial aid was cancelled, and believes that the same financial aid package would not have been available to him if he had returned to school within the academic year.  [Doc. 53 ¶ 89.]  Schuler cites evidence that is not relevant to his claim, and he does not have personal knowledge of Bursar's Office policies.

[18] Schuler "denies that his student insurance was cancelled because of the policy's expiration date.  Rather, the cancellation of his insurance was part of DU's pattern of discrimination against him."  [Doc. 53 ¶ 86.]  He does not support that assertion with record evidence, and in any event, SOF ¶ 86 does not pertain to the cancellation of Schuler's insurance.

[19] Schuler denies every statement in this paragraph but does not provide record evidence in support of his assertions.  [See Doc. 53 ¶¶ 90-92.]

whether he received financial aid to cover the costs.  [Id. ¶ 93.][20]  Schuler continued to accrue debt as a result of his stay in student housing.  Because he was not enrolled in classes, financial aid could not be used to cover his housing costs.  [Id. ¶ 94.][21]  This was explained to Schuler on several occasions.  [Id. ¶ 95.][22]  The Bursar's Office attempted to contact Schuler about his outstanding debt through voicemail, e-mail and letters on 13 separate occasions between January 11 and May 3, 2011.  [Id. ¶ 96.][23]

Schuler filed an OCR complaint against DU in the first quarter of 2011, alleging that DU retaliated against him by blocking him from registering for classes.  [Id. ¶ 97.]

Schuler remained in student housing during Spring Quarter 2011 even though he was not enrolled in classes.  Mike Furno was not aware that Schuler was not paying his housing bill and that he had accrued a balance on his account.  [Id. ¶ 98.]  Sometime in May, Joe Benson contacted Furno and told him Schuler had not been paying for his housing and needed to move out if he did not clear up the hold on his account.  [Id. ¶ 99.][24]

On May 11, 2011, an attorney representing Schuler sent a letter to Benson, asking DU to suspend its efforts to collect Schuler's debt until OCR completed its investigation into Schuler's claim of retaliation.  [Id. ¶ 100.]  After receiving the letter, Benson instructed the

---

[20] Schuler disputes this fact by citing his affidavit at paragraphs 13, 14, and 17.  Those paragraphs do not put SOF ¶ 94 in genuine dispute.  Paragraph 13 of Schuler's affidavit pertains to his communication with the Bursar's Office in August 2010, paragraph 14 pertains to the registration consequences of his housing debt and his uncorroborated belief that the Bursar's Office fabricated documents, and paragraph 17 pertains to the refund check he received in September 2010 and not being informed that he would not be able to register because of his debt.

[21] Schuler denies that his housing debts were legitimate.  [See Doc. 53 ¶ 94.]  He does not support that assertion with record evidence.

[22] Schuler denies that this was explained to him and claims that "there was a lack of communication regarding student housing costs between Summer 2010 and April 2011."  [Doc. 53 ¶ 95.]  Schuler's assertions are unsupported by record evidence.  [See id.]

[23] Schuler cites his affidavit at paragraphs 13, 14, and 17 to dispute this fact.  Again, those paragraphs do not support his assertions.  See footnote 21, above.

[24] Schuler cites his own deposition and a June 2011 e-mail he sent to Furno to dispute this fact.  [See Doc. 53 ¶ 99.]  That evidence does not support Schuler's claim that his nonpayment of debt was not the reason Benson wanted him out of student housing because Schuler does not have personal knowledge of the conversation between Joe Benson and Mike Furno.

Bursar's Office to cease collection efforts and transfer all communications with Schuler to him (Benson). Benson learned for the first time that Schuler had filed OCR complaints against DU. He is not aware of anyone in the Bursar's Office knowing about Schuler's OCR complaints. [Id. ¶ 101.][25]

Two weeks later, Mike Furno met with Schuler to discuss his housing and emailed Schuler a summary of the options available to him. According to Furno's e-mail, if Schuler wanted to enroll for Summer Quarter 2011 and remain in student housing, he needed to take care of the hold on his account and provide appropriate medical documentation by May 27, 2011; if Schuler wanted to enroll for Fall Quarter 2011, he needed to move out of student housing by June 5, 2011and provide medical documentation and clear his account hold by August 1, 2011. [Id. ¶¶ 102-03.][26]

Schuler vacated DU student housing sometime in June 2011. Around this time (the record is not entirely clear), the OCR completed its investigation and found that DU did not retaliate against Schuler. [Id. ¶ 97.] Soon thereafter, the Bursar's Office resumed its attempts to collect Schuler's balance of $9,078. [Id. ¶ 105.]

On August 10, 2011, Schuler emailed Niki Latino, Executive Director of Academic Resources and Director of Academic Advising, and requested that she meet with his doctor. Latino responded that it was not her practice to meet with healthcare professionals, but she offered to speak to Schuler's doctor about the documentation Schuler needed to provide to

---

[25] Schuler cites his own deposition testimony to dispute this fact. He does not have personal knowledge of Benson's or Bursar's Office employees' interactions or their knowledge of Schuler's case.

[26] Schuler disputes the legitimacy of DU's options but does not dispute that Mike Furno laid them out to him as described.

return from his medical stop-out.  Latino stated that Schuler needed to give her permission to speak with his doctor.  [Id. ¶¶ 107-08.][27]

Two days later, Latino e-mailed Schuler again, advising him that he still had an outstanding hold on his student account and that she had not received the medical documentation supporting his ability to re-enroll.  In the e-mail, Latino included a link to a website with details about the medical documentation he needed to submit.  [Id. ¶¶ 112-14.]

On September 13, 2011, Latino met with Schuler for approximately two-and-a-half hours and sent him a summary of their meeting.  In the summary, she defined various terms related to the medical stop-out process.  She sent Schuler a link to a website describing the information he needed to reenroll.  Over the next week, Latino responded to questions Schuler had regarding the reentry process.  [Id. ¶¶ 115-18.]  Ultimately, Schuler was not allowed to enroll for Fall Quarter 2011 because he did not submit required medical documentation or clear the financial hold on his student account.  There is nothing in the record to show that Schuler attempted to address the issues identified by Latino following their September 13 meeting.  In her affidavit, Latino states that she is not aware of any student who has taken a medical stop-out and been permitted to return to classes without first providing supporting medical documentation and clearing financial holds on his or her account.  [Doc. 39, Ex. ¶¶ 11, 21.][28]

---

[27] The parties dispute whether Schuler authorized Niki Latino to speak with his doctor.  [SOF ¶ 108; Doc. 53 ¶ 108.]

[28] Schuler denies that his lack of documentation and the financial hold were the reasons he was not allowed to re-enroll.  [Doc. 53 ¶ 109.]  The evidence he cites in a roundabout way does not support his denial.

On January 12, 2012, Latino emailed Schuler explaining he was still not eligible to return to DU because he had not cleared his financial hold or submitted necessary medical documentation.  [Id. ¶ 120.]  Five months passed.

Schuler e-mailed DU Academic Advising on May 26, 2012 asking for information about how he could resume his studies at DU.  Schuler stated that he had been "approved by [his] physician to return and this is clearly documented."  [Doc. 39, Ex. T at 2-3.]  He did not provide documentation from his doctor confirming the doctor's approval.  Niki Latino responded to Schuler's e-mail three days later and reiterated that Schuler was not eligible to return until he cleared his financial hold and submitted the required medical documentation.  [SOF ¶¶ 121-22.]

In June 2012, Schuler began calling the Bursar's Office with questions about the hold on his account and indicated he wanted a copy of his official transcript.  Schuler also retained Louise Bouzari as his attorney around this time.  [Id. ¶¶ 123-24.]  During the remainder of 2012, Schuler and DU attempted to resolve the issues between them, but their negotiations did not result in an enforceable settlement agreement.  [See Doc. 68.]  Schuler initiated this suit on February 8, 2013.

Section 504 of the Rehabilitation Act does not provide a statute of limitations; therefore, Colorado's two-year statute of limitations for causes of action premised "upon liability created by a federal statute where no period of limitations is provided" applies here.  Colo. Rev. Stat. § 13-80-102(g).  Schuler and DU agreed to toll the statute of limitations on October 25, 2012.  According to DU, Schuler's Section 504 discrimination claim can only be based on conduct that occurred on or after October 25, 2010.  [See Doc. 39 at 33-34.]

"Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Nat'l R.R. Pass. Corp. v. Morgan, 536 U.S. 101, 122 (2002).  The conduct Schuler claims to have been discriminatory here consisted of discrete acts.  While those acts are related, they are nonetheless discrete and actionable on their own terms.  See Rhodes v. Langston Univ., 462 Fed. Appx. 773, 779-80 (10th Cir. 2011) (holding disabled student's ADA and Rehabilitation Act claims of lack of classroom accessibility "[represented] discrete accessibility issues rather than a continuation by [defendant] of related unlawful acts or practices").  Accordingly, under Morgan, Schuler cannot premise DU's liability for discrimination or retaliation under the Rehabilitation Act on conduct that occurred before October 25, 2010.

Schuler argues that DU discriminated against him, in violation of Section 504 of the Rehabilitation Act, by "not allowing him to register for classes, cancelling his scholarships and financial aid, and removing him from student housing." [Doc. 53 at 38.]  For the purposes of the parties' Motions, DU does not dispute that Schuler is an individual covered by Section 504.  [Doc. 39 at 36.]  DU recognizes that it is an entity subject to Section 504. [Id.]

Section 504 requires some kind of intentional discriminatory action on the part of the defendant.  Barber ex rel. Barber v. Colo. Dept. of Revenue, 562 F.3d 1222, 1229 (10th Cir. 2009); see also 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, *solely by reason* of his or her disability, . . . be subjected to discrimination.") (emphasis added).  Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its

questioned policies will likely result in a violation of federally protected rights."  Barber ex rel. Barber, 562 F.3d at 1228-29 (quoting Powers v. MJB Acquis'n Corp., 184 F.3d 1147, 1153 (10th Cir. 1999)).  "The test for deliberate indifference in the context of intentional discrimination comprises two prongs:  (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that . . . likelihood.'"  Id. (quoting Duvall v. County of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001)).

DU's handling of Schuler's scholarships was not discriminatory, in spite of Schuler's attempts to cast it in a negative light.  The undisputed facts show that DU never actually "cancelled" Schuler's scholarships in the sense that Schuler was ever left worse off than the year before.  Schuler received $1,000 per quarter from the J.J. Johnston Scholarship from Fall Quarter 2007 through Spring Quarter 2009.  For the 2009-2010 school year, DU took Schuler off the J.J. Johnston Scholarship and put him on the Brandenborg Scholarship, which gave him $1,333.36 per quarter.  [SOF ¶ 40.]  For the 2010-2011 academic year, DU took Schuler off the Brandenborg Scholarship and put him on the Reano Scholarship, which also gave him $1,333.36 per quarter.  [Id. ¶ 43.]  Schuler fails to provide a reason as to why these actions constitute "discrimination" and the Court cannot conceive of one.

Even if DU's handling of Schuler's scholarship could be deemed "discrimination," DU has explained, and Schuler has not genuinely disputed, that it converted his J.J. Johnston Scholarship to the Brandenborg Scholarship because the Brandenborg was only available to students with high financial need, and giving Schuler the Brandenborg opened up J.J. Johnston Scholarship funds for other students.  [Id. ¶¶ 36-39.]  While there is no explanation given for DU's transfer of Schuler from the Brandenborg to the Reano Scholarship, there is no evidence suggesting that it was done because of Schuler's disability or with deliberate

indifference to his rights.  Schuler points out that DU cancelled his Reano Scholarship in November 2010 [Doc. 53 ¶ 43] but neglects to say that he took a medical stop-out in Fall Quarter 2010 and did not return to school, which made him ineligible for scholarship funds.

Schuler claims that DU intentionally discriminated against him by cancelling his financial aid.  Schuler's financial aid was reversed when he was not enrolled in classes, as required by federal law and DU policy.  [SOF ¶¶ 59, 89.]  There is no evidence in the record showing or supporting an inference that DU was motivated by Schuler's disability or acted with deliberate indifference in handling his financial aid.

Schuler claims that DU discriminated against him when it removed him from student housing and prohibited him from re-enrolling in classes after his second medical stop-out. The record shows that DU allowed Schuler to stay in student housing for approximately seven months while he was not taking classes (November 2010 to June 2011), and only removed Schuler from student housing because he failed to register for classes and pay his housing-related student debt.  The record also shows that DU prohibited Schuler from re-enrolling in classes for the same reasons.  On multiple occasions, both in person and via e-mail, Niki Latino explained to Schuler what he needed to do to return to school.  For whatever reason, Schuler failed to pay off his debt or obtain medical documentation.  That is not DU's responsibility.  The record does not support an inference that DU intentionally discriminated against Schuler when it removed him from student housing and refused to re-enroll him.

Schuler repeatedly asserts, without support, that DU officials conspired to put him in student debt by claiming he was not enrolled in classes in Summer 2010, which precluded him from receiving financial aid that could have been used for student housing, even though

he completed his Incomplete in Cost Management in Summer 2010. As explained by Joe Benson, a student completing an "Incomplete" class is not formally registered for the class in the quarter he completes it. The "Incomplete" grade from the earlier quarter is simply changed. Consistent with that policy, Schuler's transcript shows that he was not enrolled in a class in Summer Quarter 2010. [Doc. 53, Ex. 15.] Although DU might have handled this matter differently, its failure to do so does not support an inference that it was motivated by discriminatory intent.

Accordingly, DU is entitled to summary judgment on Schuler's Section 504 discrimination claim.

Schuler claims DU retaliated against him for filing an OCR complaint in 2009 by not allowing him to register for classes in Winter and Spring Quarters 2011, cancelling his scholarships and financial aid, cutting off his health insurance, and evicting him from student housing. [Doc. 1 ¶ 67.] Section 504 retaliation claims are analyzed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999). The plaintiff must first establish a prima facie case of retaliation by showing: (1) he engaged in protected activity; (2) he suffered a materially adverse action by the defendant either after or contemporaneous to the protected activity; and (3) a causal connection between the protected activity and the adverse action. Proctor v. UPS, 502 F.3d 1200, 1208 (10th Cir. 2007). The burden then shifts to the defendant to assert a legitimate, nondiscriminatory reason for the adverse action. Id. If the defendant does so, the burden shifts back to the plaintiff to show that the proffered reason is a "pretext masking discriminatory animus." Id.

DU admits that Schuler engaged in protected activity by filing his OCR complaints and that the actions Schuler complains of are "adverse" within the meaning of the McDonnell-Douglas Corp. test. [Doc. 39 at 39.] The Court will assume a causal connection can be made between the OCR complaints and the adverse actions, thus establishing Schuler's *prima facie* case.

DU had legitimate, nondiscriminatory reasons for prohibiting Schuler from registering for classes in Winter and Spring Quarters 2011, cancelling his scholarships and financial aid, cutting off his health insurance, and removing him from student housing—in short, Schuler failed to follow simple, direct instructions that he get a doctor's note supporting his return and clear the financial hold on his account.

Schuler argues pretext can be inferred from the "very different way" DU treated him after his first medical stop-out as compared to his second stop-out. [Doc. 53 at 45.] In fact, Schuler successfully completed the re-entry process for his first medical stop-out and was re-enrolled in classes *after* he filed an OCR complaint in January 2010, which belies any inference that DU had animus towards Schuler for engaging in protected activity. The "very different way" DU treated him following his second stop-out was not different at all; what was different was that Schuler did not comply with the re-entry requirements.

Schuler also takes issue with the assistance DU gave him in trying to re-enter after his second medical stop-out, which he claims suggests pretext. [Id. at 45-46.] Schuler's characterization of DU's conduct is contradicted by the record evidence, which shows that DU officials allowed Schuler to live in student housing for approximately seven months without being enrolled in classes or paying for it; and repeatedly attempted to help Schuler

understand what he needed to do to re-enroll, even though he had already successfully followed the re-enrollment procedure following his first stop-out.

Schuler restates his argument concerning the legitimacy of the debt he accrued in the Summer Quarter of 2010.  Again, Schuler withdrew from classes at the beginning of the quarter, and though he completed his Incomplete in Cost Management that summer, that did not mean he was enrolled in a class that summer.  Schuler claims that pretext can be inferred because DU caused the confusion regarding Schuler's summer 2010 housing costs by agreeing in the 2009 OCR Resolution Agreement that Schuler could retake Cost Management with another professor "at no additional cost to him"; then refused to work with Schuler to come to some resolution; and then finally did not waive the debt outright so Schuler could get back in school.  [Doc. 53 at 48-49.]  The terms of the OCR Agreement plainly refer to the tuition cost of Cost Management, not free student housing while Schuler completed one course.  Schuler's assertion that DU refused to work with him to come to a resolution is contradicted by the record, which shows that Mike Furno allowed him to stay in student housing for an extended period of time, and that Niki Latino tried to help Schuler get back into classes.  Schuler's position that DU's failure to waive his debt demonstrates discriminatory animus is meritless.

Schuler has failed to create a genuine dispute of material fact on the issue of pretext.  Based on the undisputed facts, a reasonable juror could not conclude that the legitimate reasons DU has provided for its actions are a pretext for unlawful retaliation.

The Court declines to exercise supplemental jurisdiction on DU's second and fourth counterclaims (assumpsit and unjust enrichment, respectively) to recover Schuler's student debt.

Upon the foregoing, it is

ORDERED that Defendant University of Denver's Motion for Summary Judgment [Doc. 39] is granted as to Plaintiff Stephen Schuler's First and Third Claims for Relief; and it is

FURTHER ORDERED that Defendant University of Denver's Second and Fourth Counterclaims are dismissed without prejudice.  The clerk shall enter judgment dismissing this civil action and awarding Defendant costs.

Dated: October 1, 2014

BY THE COURT:

s/Richard P. Matsch

_____

Richard P. Matsch
Senior District Judge