IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| STEPHEN SCHULER, JR., Plaintiff, | ) | |
| vs. | ) | 1:13-cv-00358-RPM |
| THE UNIVERSITY OF DENVER, Defendant. | ) | |

---

HEARING - CLAIMS AND COUNTERCLAIMS
TRANSCRIPT OF PROCEEDINGS

---

Proceedings held before the HONORABLE RICHARD P. MATSCH, U.S. District Judge for the District of Colorado, on the 25th day of September, 2014, in Courtroom A, the United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiff: M. Gabriel McFarland, Esq.
Evans & McFarland, LLC-Golden
910 13th Street, #200
Golden, CO 80401

For the Defendant: Austin E. Smith, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.-Denver
1700 Lincoln Street, #4650
Denver, CO 80203

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (Continued)

For the Defendant:

Heidi Kristina Wilbur, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.-Denver
1700 Lincoln Street, #4650
Denver, CO 80203

P R O C E E D I N G S

(At 10:28 a.m. on September 25, 2014, in the United States District Court at Denver, Colorado, before the HONORABLE RICHARD P. MATSCH, U.S. District Judge, with counsel for the parties present, the following proceedings were had:)

THE COURT: Please be seated. Good morning.

We are in Civil 13-358, Stephen Schuler, Jr., against The University of Denver. We are here on defendant's motion for summary judgment, which is now directed to the first and third claims for relief in the plaintiff's complaint with claims under the Rehabilitation Act for discrimination and retaliation.

So, Mr. McFarland, for the plaintiff?

MR. McFARLAND: Yes, Your Honor. Gabe McFarland for Mr. Schuler.

THE COURT: And Mr. Smith and Ms. Wilbur--

MR. SMITH: Yes, Your Honor--

THE COURT: --for Denver--University of Denver.

You know, the way I understand the case now is that the plaintiff is claiming that the--and the focus that I think for our discussion this morning is on this matter of, I guess, the change in scholarships and after this second stop-out the denial of reenrollment for, I guess, the fall quarter of 2011 and the spring quarter of 2012. And there is

an issue that was briefed on the statute of limitations. I am in agreement with the defendant's position on the statute of limitations.

So all of this about the accommodation or not accommodation of oral presentations and so forth, I think, we don't need to talk about.

What we do need to talk about are these two things. And I must say that I am confused about financial aid. We have in this case, of course, the counterclaim, because Mr. Schuler stayed in the student--I don't know whether it's student housing, but he was--yeah, I guess it was student housing--and ran up a bill, and that involved whether he could or couldn't use--you know, because he wasn't enrolled, he wasn't entitled to be in the student housing, as I understand it. But I see in here references to return of financial aid, and I'm very confused about financial aid.

So I'll hear from counsel for the University in support of this motion.

MR. SMITH: Thank you, Your Honor. And it may make sense just to address these two issues straight on.

THE COURT: Yeah.

MR. SMITH: The scholarships that Mr. Schuler received never declined in value in the times he received them. The names changed.

THE COURT: Actually, it increased, didn't it?

MR. SMITH: It did, Your Honor.

THE COURT: By a couple of hundred dollars.

MR. SMITH: Correct. And then I think the final increase was just a few dollars.

THE COURT: I'm sorry?

MR. SMITH: I think the final increase from the last two scholarships was less, but there was a few hundred dollar increase from the original scholarship to where he ended up.

THE COURT: Yeah.

MR. SMITH: But the important piece there, the school determines which students are eligible for scholarships. And so at the time when he was receiving his first scholarship, it didn't base that on need. And so in order to free up those funds, when it was determined that Mr. Schuler would qualify for another scholarship, the school may move a student to that later scholarship so that it can maximize the use of its funds and distribute them to as many students as possible. So it's a rather common practice. There is no evidence or as far as I--

THE COURT: There is no property right in a scholarship, I guess--

MR. SMITH: Correct.

THE COURT: --is what you're saying.

MR. SMITH: And I don't think there's any evidence that any of these moves were because of his medical conditions at

all, rather an attempt to try and maximize the funds.

THE COURT: Well, to me, the real focus here is this interaction with this Latino?

MR. SMITH: Correct, Your Honor.

THE COURT: Yeah. The director of--well, in dealing with the reentry process, that's kind of the focus here, I think. So, as I understand it, the focus of that comes down to medical documentation and clearing financial holds, and that's where I get into this confusion about financial aid--

MR. SMITH: Right.

THE COURT: --because when it talks about restoring financial aid, I don't know what that--how does that work?

MR. SMITH: So the financial aid comes from the government in this case, so the government determines--

THE COURT: The United States government?

MR. SMITH: Correct, Your Honor.

THE COURT: We've got other governments.

MR. SMITH: That's true. It is--well, it's the United States government, and that's what brings us under the Rehab Act in this case.

THE COURT: Yes, I know. That's how we get jurisdiction with that.

MR. SMITH: Right. And so you're only entitled to it if you remain enrolled in the school.

THE COURT: Yes.

MR. SMITH: So, for example, the summer quarter that becomes at issue, if you register for classes and you qualify for financial aid but ultimately withdraw before a certain deadline, then you’re not entitled to receive the aid. You only receive the aid if you’re in school.

And so in this instance what happened is Mr. Schuler wasn’t eligible to receive aid, because he wasn’t enrolled in classes. That’s how he incurred the debt for the housing while he was still in student housing but did not have the automatic student financial aid to pay for it.

THE COURT: And does the--who makes that determination about financial aid?

MR. SMITH: Well, the school communicates it to the students based on the guidelines set out by the government. So once the deadline passes, if a student has withdrawn from classes or has not enrolled, then the aid money is not disbursed to the student. If the student remains enrolled past that deadline--

THE COURT: Well, somewhere I got it that the financial aid is returned.

MR. SMITH: It can be.

THE COURT: Returned to whom?

MR. SMITH: Back to the government, Your Honor.

THE COURT: Yeah, not the--I guess maybe it was the syntax, but I gather that--that really confused me. How

would they be returning financial aid to Mr. Schuler? He didn't get financial aid during the relevant time; right?

MR. SMITH: Correct.

THE COURT: Okay. And the relevant time is the summer?

MR. SMITH: It starts in the summer of 2010 and goes through that next medical stop-out--

THE COURT: Yeah.

MR. SMITH: --where all of what you just started describing with Dr. Latino--I believe he has his Ph.D.--Dr. Latino came on the scene to try and help him with his reenrollment.

THE COURT: Did she handle the first stop-out too?

MR. SMITH: She did not. I do not believe she did.

THE COURT: All right. Well, that's not an issue, but there's a difference between what happened in the first stop-out and reenrollment and what happened in the one that we're concerned with this morning.

MR. SMITH: Correct.

THE COURT: And in terms of--well, the medical--do I understand this correctly? The medical documentation alone is a legitimate basis for denying reenrollment.

MR. SMITH: Correct, Your Honor. So to come back from the stop-out, he needed to bring medical documentation clearing him from whatever medical condition made him eligible to receive it.

THE COURT: Yeah. And he never--I guess his doctor at that time was this Neil Weiss?

MR. SMITH: Weiss. Correct.

THE COURT: Weiss, yeah. Okay. And there is some dispute here about whether this Dr. Latino--

MR. SMITH: I believe it’s Doctor. I think she has a Ph.D.

THE COURT: --should have contacted Weiss.

MR. SMITH: And she offered to, Your Honor, through Mr. Schuler but never received any sort of written authorization to do so. So she was not in a position to just call Dr. Weiss and say, hey, I have a student here; can you provide me documents?

THE COURT: Yeah, well, he wouldn’t respond to her--

MR. SMITH: That’s right.

THE COURT: --I assume because of the privacy--

MR. SMITH: Correct.

THE COURT: --medical privacy. So--well, I think that’s your position that--

MR. SMITH: It is, Your Honor.

THE COURT: --you had this--the University had legitimate non-discriminatory, non-retaliatory reasons for not letting him reenroll and for claiming the money under the failure to pay for the student housing. You’re still claiming that, I take it.

MR. SMITH: We are. I mean, Your Honor, the housing debt--so you have the medical stop-out issue, which he needed the documentation for. But even if he did that, really the only stick, if you will, the school has to collect money is to not let students continue to go to school until they receive the money or graduate. And so he would have needed to present the medical documentation and clear the hold.

At one point the bursar's office had entered into an agreement, you may recall, to allow a payment plan, but he didn't make payments.

THE COURT: Yeah, well, that was part of your overall settlement agreement argument, but we don't have that now.

MR. SMITH: Well, this is separate, Your Honor. This was when he was still a student. The bursar's office reached out to him. He agreed to make payments.

THE COURT: Well, yeah, for--yeah. And he paid $12.00 or--

MR. SMITH: $12.00.

THE COURT: Yeah, right, okay.

MR. SMITH: So they did work with him on that or tried to work with him but ultimately received nothing more than the $12.00.

THE COURT: All right. Well, I'll hear from Mr. McFarland. Thank you.

MR. SMITH: Thank you, Your Honor.

MR. McFARLAND: Thank you, Judge. I want to just set up the chronology to make sure we're all on the same page and because I think it's important.

THE COURT: All right, sure.

MR. McFARLAND: Mr. Schuler started at DU in the fall of 2007. DU is on a quarter system, so you have--

THE COURT: Right.

MR. McFARLAND: --fall of 2007, winter 2008, spring 2008, fall 2008. And then you flip over to the next year, winter 2009. No problems from the fall of 2007 through the fall of 2010, at least given the Court's determination on the--

THE COURT: Statute of limitations.

MR. McFARLAND: --statute of limitations issue. The first stop-out is requested and granted in the winter of 2010.

THE COURT: Right.

MR. McFARLAND: And he is--Mr. Schuler is out the winter of 2010. He resides in student housing the winter of 2010. He reenrolls for classes in the spring of 2010. No problems, no issues. He stays at the school in the summer of 2010. He continues to live in student housing.

THE COURT: Now, when he reenrolled after this first stop-out, he did provide, whatever it's called, a clearance of something from--

MR. McFARLAND: He gave a letter from Dr. Weiss or another doctor that said--

THE COURT: Yeah. Okay.

MR. McFARLAND: --he’s good to be back in school.

THE COURT: Right.

MR. McFARLAND: So he reenrolls in spring. He stays there in the fall in--or excuse me--in the summer. He stays in the student housing, and he takes or retakes his Cost Management class, which he previously received an “F” in in the winter of 2009 and sort of led to some of the OCR complaints--

THE COURT: Right.

MR. McFARLAND: --and an OCR resolution agreement and all those things.

THE COURT: They resolved that by letting him take it.

MR. McFARLAND: That’s right.

THE COURT: All right.

MR. McFARLAND: And what they said in that OCR resolution agreement is that, “You can retake that class at no cost to you.” I don’t know what DU was contemplating when it said no cost to them, but I think it’s reasonable for Mr. Schuler to believe that when they say, “You can retake this class at no cost to you,” that he’s going to have someplace to live while he retakes that class. And he--

THE COURT: Now, he takes just this one class that--

MR. McFARLAND: One class, summer of 2010.

THE COURT: Right.

MR. McFARLAND: And that's important because the debt that--the alleged debt that held him up from registering in the winter of 2011, Mr. Benson, their finance guy, testified that hold was because he lived in student housing in the summer of 2010, and he wasn't enrolled and he wasn't taking classes. And, as a result, he wasn't allowed financial aid. And because he didn't have the financial aid for the summer of 2010, there is a charge that he is responsible for. That's why he couldn't register in the winter of 2011.

Now, there's a couple issues there. One is the OCR agreement. Should he have been charged anything while he is retaking that Cost Management course in the summer of 2010? And there is an e-mail that cited, you know, he got his grade on August 19th, B+, retaking the Cost Accounting course.

So there's a question under the OCR agreement: Should he have been charged anything for his student housing? And the second question is: Was he enrolled? DU's position is he wasn't enrolled in school; he wasn't taking classes; or I think they said he wasn't formally enrolled in school. I don't know what that means. He was living in student housing; he was going to classes on the University of Denver with a University of Denver professor; and he received a grade in that class.

And I haven’t seen anything other than what they say, that he was formally enrolled. I haven’t seen any, I don’t know, formal policy or directive or something else that says when you retake a class you’re not formally enrolled in the University. And that doesn’t--it defies common sense, from my perspective.

So setting it so we’ve got the OCR piece, which, in my opinion, tells us that he shouldn’t have been charged anything, he was also enrolled in class, in school at DU in the summer of 2010. And, as a result, he was eligible for the financial aid that should have paid for his student housing during this period of time and/or the scholarships.

So that’s the summer. The fall comes. And even though he allegedly has these outstanding housing charges, because he hasn’t been paying for that and he hasn’t been enrolled in school according to DU, they allow him to register for classes, all his classes, in the fall of 2010. And he registers without any problems, without any hiccups. And then he has more problems, and he goes back to the school and says, “Hey, I need to do a second stop-out,” and they allow him to do the second stop-out.

THE COURT: Now, what is the date of that?

MR. McFARLAND: The second stop-out?

THE COURT: Yes.

MR. McFARLAND: You know, I have it as the fall of 2010.

THE COURT: Okay, but it's during the fall quarter. He enrolls but then he can't make it.

MR. McFARLAND: It wasn't too--I mean, I don't know if it was--it was like the first third, is my recollection, of that--maybe a third of the way--

THE COURT: So he starts attending classes?

MR. McFARLAND: That's right.

THE COURT: All right.

MR. McFARLAND: And then he starts missing, and then there's a recommendation, hey, if you're going to miss a bunch of classes, maybe you should think about a second stop-out.

THE COURT: Yeah, okay.

MR. McFARLAND: Okay. So no problems registering in the fall, no problems stopping out in the fall. And, again, he's living in DU housing this whole time. And nobody ever says to him, you know, while you're living in this student housing, you got real problems, and you already owe this other debt from the summer. He isn't understanding that. He's not told any of that.

He gets himself together. He tries to enroll in the winter of 2011, and at this point he's told, "You can't enroll." And he runs around and he can't figure out why and why not. And eventually he's told that, "You can't enroll because you have this outstanding debt from housing and

because you haven't given us this piece of paper." Now--

THE COURT: Yeah. And that's the interaction with Latino.

MR. McFARLAND: Now, the timing on that is interesting. I haven't seen anything to suggest that that information was communicated to him until the spring of 2011. And if I'm mistaken, I invite opposing counsel to provide the document that shows that.

But the communications with DU and this Dr. Latini (phonetic) that I've seen start in the spring and the summer and the fall of 2011. There's several months that go by without that communication.

THE COURT: What starts the winter quarter? When does it start?

MR. McFARLAND: I believe it starts in January.

THE COURT: Okay.

MR. McFARLAND: So I think they register in December, and then the classes start after the Christmas break.

THE COURT: Well, I thought this interaction with this Dr.--is it Latini?

MR. SMITH: Latino.

MR. McFARLAND: Latino.

THE COURT: Latino, yeah--is in September.

MR. McFARLAND: Of 2011.

THE COURT: Yes.

MR. McFARLAND: Yes. I think that's right.

THE COURT: All right.

MR. McFARLAND: So what I'm saying is that when he tried to enroll, it's December 2010, it's January 2011, seven, eight months beforehand.

THE COURT: Okay.

MR. McFARLAND: And then when he finds out that there is this hole and he's never told, at least, again, as far as I can tell, the genesis of that debt, that it was a result of this summer stuff or any of that, he's told, "You've got to pay and you've got to get the medical piece."

And Stephen Schuler says, "I don't have any money. I mean, when I'm not living at school, I'm living in a friend's garage or my car. So if I can't remove the financial piece, if I can't resolve and I can't work that and I've done what I can in December 2010 and January 2011, in February, in March, in April, what's the point? I mean, I can get this other piece. I can get this document from Weiss. I can focus on that. But I can't get the money."

So when you add up that--

THE COURT: What is his condition at this time?

MR. McFARLAND: You know, he still goes through terrible bouts of anxiety, which leads to serious bouts of depression.

THE COURT: Well, he also at one time had attention deficit, didn't he?

MR. McFARLAND: He did, and I think he does. I mean, his list of--

THE COURT: Well, let me just ask you this question: Are you making any claim that part of the problem here with dealing with these requirements is his own disability? I mean, he says he's ready to go into school, so it appears to me that that's not the issue; but I want to be clear about what you're contending.

MR. McFARLAND: I don't think that's the issue. I mean, I think--

THE COURT: Okay.

MR. McFARLAND: I think what happened here is I think Stephen was a pain in the butt.

THE COURT: Okay.

MR. McFARLAND: And because of his disability, he's a pain in the butt and he's a pain in the butt. And they got tired of dealing with him because of his disability.

THE COURT: Well, why didn't he--I haven't read everything that's been submitted, because there's a lot.

MR. McFARLAND: Yes.

THE COURT: And that's why I'd like to have oral argument to make sure I understand the case. But why doesn't he get Dr. Weiss to send a letter?

MR. McFARLAND: When he's told that he's got to do two things and the way it's presented to him is, "You've got to

get rid of the hold or you've got to take care of the financial piece, and you've got to get a letter,"--

THE COURT: Right.

MR. McFARLAND: --his brain says, "How do I resolve the first one that was presented? How do I resolve the financial hold?" And he doesn't have any way to resolve it. He doesn't have any way to get money.

THE COURT: Yeah, but what about the letter?

MR. McFARLAND: He could have got the letter, but the letter doesn't do him any good.

THE COURT: Well, why didn't he get the letter?

MR. McFARLAND: Because the way--so if he comes to me and he says, "What do I do?" I say, "Let's get this letter, and then let's try to work on the finances."

THE COURT: Right.

MR. McFARLAND: What he said is, "Why does it make--why should I waste time, energy, effort getting this medical release if I still have this hold and I have no way to resolve the financial piece."

THE COURT: Well, are you representing him at this time?

MR. McFARLAND: Mr. Schuler?

THE COURT: Yes.

MR. McFARLAND: Yes.

THE COURT: I don't mean today. I know you're representing him today. I'm talking about for this

enrollment.

MR. McFARLAND: No, this is before--this is before my time and before any lawyer's time.

THE COURT: All right. I just want to be clear.

MR. McFARLAND: Yes.

THE COURT: So you're talking about how you would have advised him, but that isn't how he saw things.

MR. McFARLAND: Right. And I think from a legal perspective, let's assume that he did get the letter.

THE COURT: Right.

MR. McFARLAND: Great. He still wouldn't be in school, because he didn't resolve the financial piece.

THE COURT: Well, maybe not.

MR. McFARLAND: Well, it's not maybe not, because what the University has said--this is Mr. Benson testifying--what the University said through Mr. Benson in his deposition is that when students register for fall semesters, they get a break. The school is really lenient. If they have financial holds on their account, whether it's from housing or parking or any other student charge, not a big deal. The school lets it slide right by.

But when you go to enroll in the winter, the school doesn't make any exceptions for a hold, and you don't get to register under any circumstances in the winter or in the spring or in the summer if you have a financial hold. Again,

it’s just--

THE COURT: Okay.

MR. McFARLAND: Those are just--to me, they’re these rationalizations for why this student who, as far as I can tell, shouldn’t have had any financial hold as a result of the summer 2010 semester anyway, was allowed to register in the next semester but not the semester after.

THE COURT: Okay. So how do we tie this to disability? I mean, you know, you’re here under the Rehab, intentional discrimination, and you’re here for retaliation because of protected activity connected with disability. What you’re presenting here is an unreasonable position taken by the University in reenrollment, but tie that to the statute.

MR. McFARLAND: Well, when I think about the factual timeline that we have gone through and I ask myself, why would--how did this--I mean, how did we get there? Why didn’t they talk to him in the spring and tell him about the financial hold in the winter of 2011, in January, February, or March? Why did they put this hold on his account, and why didn’t somebody like Mr. Benson look at it at the time and say, geez, we’ve got this OCR complaint that it’s no cost, and he’s actually taking a class, and he got a grade for that class so financial aid should be available, there shouldn’t be any debt at all?

But when I look at that whole timeline, and I look

at that in a light that is most positive to Mr. Schuler, and I ask myself what's the explanation, unless the answer is discrimination and retaliation, I don't have an answer.

THE COURT: Well, you said "pain in the butt." That's your elegant way of saying discrimination; right?

MR. McFARLAND: Well, yeah, but it's tied to--it's tied to his disability. This is a guy, because of--

THE COURT: How is it tied?

MR. McFARLAND: --his anxiety I get ten e-mails a night. And that doesn't mean that I can just be dismissive of them or if I get tired of getting those e-mails I can just quit on him as his lawyer.

He's got disabilities. He's asked for a stop-out. He does the exact same thing he did the first time around, only he can't get in, and they refuse for months to explain why he can't get in. And when they finally explain it, he doesn't have any ability to change it, because he doesn't have any money. And nobody wants to talk to him, and nobody wants to deal with him. And you can tell that from Dr. Latino, some of her e-mails: "I talked to you for 2-1/2 hours. I'm not going to have this conversation again."

And I would submit that's way after the relevant time period, but that's how she felt then; that's how the administration felt in the fall of 2010 and in the summer of 2011.

THE COURT: What relief are you seeking here? He doesn't want to go back to DU. He's already--didn't he go to Metro or somewhere?

MR. McFARLAND: Yeah, he's at CU now.

THE COURT: CU, yeah.

MR. McFARLAND: We want monetary compensation.

THE COURT: Measured by what?

MR. McFARLAND: There's a couple different ways to measure it. I know in our Rule 26 disclosures we talked about for this lost opportunity for wages. And I know that Your Honor was not--

THE COURT: Yeah, I was more than skeptical about that.

MR. McFARLAND: More than skeptical about that. But if you just look at tuition alone, for example, it's cost him a lot to get to CU and to pick up--and the number of--you know, when he--not all of his credits transferred. So now, instead of having, you know, a year or something left at DU, he's got 2-1/2 years at CU, and there's a tuition piece associated with it.

There is sort of--I think there is a legitimate time value of money. I don't know that it's necessarily associated with a lost profits case.

THE COURT: Okay.

MR. McFARLAND: Thank you, Your Honor.

THE COURT: All right. So, Mr. Smith?

MR. SMITH: Your Honor, I'd like to address some of the items Mr. McFarland raised if I can.

THE COURT: I'd like you to.

MR. SMITH: Just a few. The summer 2010 housing debt. First, the first time we've ever heard the argument that he didn't leave, there shouldn't have been a cost to him, or that the OCR agreement said it shouldn't have been a cost, was at summary judgment briefing. Mr. Schuler's actions didn't evidence that, because he agreed to the payment plan, engaged in discussions with the bursar's office that fall. We had the e-mails from the bursar's office and records showing they talked to him in June and July of 2010, January 11, 13, 18, 26, and so on.

So at no point prior to this point was there ever a suggestion by Schuler or anyone else that, hey, I misunderstood.

THE COURT: Well, what constitutes--I mean, Mr. McFarland has raised the question: What constitutes being enrolled?

MR. SMITH: Well, it's a good question. So on his transcript there is no class in the summer of 2010. The class he took corrected an incomplete from a previous semester. And so to the extent we want to argue whether he was enrolled, there is no record of him being enrolled. He was allowed to recomplete a class that had already been paid

for under his previous aid and is already registered under another semester.

THE COURT: But he does go to class.

MR. SMITH: He went to class that summer, correct.

THE COURT: Yeah, with other people. I mean, this isn't a tutorial thing; right? He's--

MR. SMITH: I presume.

THE COURT: --in a regular class.

MR. SMITH: I presume.

THE COURT: Although he gets the accommodation that he doesn't have to get up in front of the group, I guess.

MR. SMITH: I think that's right, Your Honor.

THE COURT: Okay. But you're saying--so what happens for his credit for that? That goes back to a previous quarter?

MR. SMITH: It was correcting an incomplete from a previous quarter.

THE COURT: Okay.

MR. SMITH: So there is no credit in that quarter, and he was not charged for that class. There was no payment for the class, so there was no aid to be eligible for.

THE COURT: Right, yeah.

MR. SMITH: There was no need for aid, so the government rules again kick in. DU has no ability to then just go to the government and say, You should give aid anyway. And I

haven't heard any evidence that there was ever a discriminatory intent or evidence of discrimination or retaliation in the way this aid either was or wasn't disbursed.

THE COURT: No, I think this goes to the argument that he shouldn't have been billed for being in student housing as not being enrolled when he was taking a class. That was the argument.

MR. SMITH: And, Your Honor, I think that argument probably could have or perhaps could have been addressed at any point from summer of 2010 through him leaving the school, because I don't recall it ever being raised.

THE COURT: Yeah.

MR. SMITH: He did engage in discussions that year. We know from the record, as Your Honor pointed out, the $12.00 payment and the payment plans. And so the argument that he just didn't know about this until later I find difficult to understand.

THE COURT: Okay.

MR. SMITH: I mean, this is something he was aware of at the time. The fall registration is something we ought to discuss. The reason for the fall, as we understand it, is students--the debt that students may or may not incur doesn't actually go from bursar's office to registrar in time to know whether someone has a debt for fall quarter, okay, so it's

their effort to say, We don't want to exclude anyone, because we don't know what the debt structure is going to look like for somebody by the time we get to fall.

So it's that way across the board for everyone. It's not a matter of, Mr. Schuler, do you have a parking ticket from summer? They're not going to prevent you from registering for fall. They will prevent you from registering for the winter because of the time the financial aid has to be submitted, and that was Mr. Benson's explanation.

So it is true that in the fall he was permitted to register, stayed enrolled long enough to keep his aid. He could have then paid back DU out of his refund, his aid refund, for the housing; but DU had no right to apply aid given to him in a later quarter.

THE COURT: Now, you use the word "refund" there again, which--

MR. SMITH: Right.

THE COURT: --confuses me now. He enrolls, and then he takes the stop-out.

MR. SMITH: Right.

THE COURT: So when he enrolls, he gets financial aid?

MR. SMITH: And a refund potentially. So if a student qualifies for--just to use round numbers--$50,000 in aid and scholarships but tuition and fees cost $25,000, the student will receive a refund to either use to live off of, buy

books, you know, do whatever--presumably can do whatever they want to with it. But it's meant for their education. So students do receive refund checks every semester if they qualify for more aid than the tuition fees cost.

THE COURT: How is that a refund?

MR. SMITH: Well, it's called a refund, but it's--

THE COURT: It doesn't seem--

MR. SMITH: You're just giving him the rest of his debt.

THE COURT: Yeah. Okay.

MR. SMITH: But that's what--internally it's called a refund. The students are told, "You're receiving an aid refund check." But as someone who's still paying his debt, I don't know that I see the refund piece, and will be paying for a long time.

THE COURT: Yeah.

MR. SMITH: So that's how we get through that period.

So the communications we discussed with the bursar started early--we have in the record and we cite on the summary judgment--that start June and July, like I mentioned, throughout the spring of the following year between the bursar's office leaving him voice mails, e-mails, and letters about his debt.

You know, there is an inference in the brief--

THE COURT: So he's out on the stop-out from October or November through the next summer; is that right?

MR. SMITH: Correct, I mean, through today, arguably.

THE COURT: Well, no, I'm talking about getting up to the reenrollment.

MR. SMITH: Right.

THE COURT: That starts in the summer--

MR. SMITH: Correct.

THE COURT: --for the fall, yeah. And that's where we get into the cutting edge of the case. Okay.

MR. SMITH: And, you know, there was just a couple of statements made that I think are worth correcting in the record, too. Mr. McFarland referenced an e-mail from Ms. Latino that is in the record, stating that they met for 2-1/2 hours and she didn't want to deal with him again. It doesn't say that. It actually lays out the steps. It states, "We met for 2-1/2 hours last week, and I continue to receive e-mails with similar questions at least a few times a week. You need to address the following before you will be allowed to register." And she says--first she addresses the stop-out paperwork. Finally--

THE COURT: What is this you're reading from, an e-mail?

MR. SMITH: This is an e-mail in the record submitted in support of summary judgment.

THE COURT: Yeah. All right.

MR. SMITH: Exhibit T, Your Honor.

THE COURT: T. Okay.

MR. SMITH: It is dated 20 September 2011. It's right after Latino got involved, it seems like.

THE COURT: Okay.

MR. SMITH: So I think we're assuming a lot and inferring a lot in the record. But, you know, the fact remains, there is no medical stop-out document provided and no attempt I can see anywhere for him to work with the bursar's office again on either a payment plan, an explanation that if I am able to enroll I will use a refund check--confusing word I know--from later aid to pay this back. It's just not there.

And I guess the last point I would say at the end of the day--and Your Honor was pointing it out--I just don't see evidence of any discriminatory intent by anybody. I don't think the fact that he was a pain in the butt necessarily means that the school is discriminating against him because of his disability, even if that's true.

THE COURT: There is no circuit opinion making that a test for discrimination.

MR. SMITH: I'm not aware of one, Your Honor.

THE COURT: Okay. All right.

MR. SMITH: So that's all I've stated. I just wanted to clarify a few things that we had heard.

THE COURT: What if I grant this motion? What are we going to do with this counterclaim?

MR. SMITH: So the counterclaims over the debt, I actually don't believe Your Honor would have to or even want to exercise supplemental jurisdiction over a $9,000 state law counterclaim. So I would assume it would be dismissed.

THE COURT: Without prejudice.

MR. SMITH: Without prejudice. And whether or not my client is going to pursue that in State Court I can't represent, but I find it highly doubtful.

THE COURT: Okay. All right. Well, this stands submitted. We'll give you a written decision. Court's in recess.

(11:05 a.m. - Whereupon, the proceedings were concluded.)

TRANSCRIBER'S CERTIFICATE

I hereby certify that the foregoing has been transcribed by me to the best of my ability, and constitutes a true and accurate transcript of the mechanically recorded proceedings in the above matter.

Dated at Aurora, Colorado, this 28th day of November, 2014.

/s/ Sylvia Besel

Sylvia Besel
Federal Reporting Service, Inc.
17454 East Asbury Place
Aurora, Colorado 80013
(303) 751-2777